EDWARD HINES LUMBER COMPANY, Plaintiff-Appellee, v. DELL CORPORATION et al., Defendants-Appellants.—(DES PLAINES LUMBER AND COAL COMPANY, Cross-Plaintiff-Appellee.)

First District (1st Division)   No. 62307

Opinion filed May 23, 1977.

Mandel, Lipton & Stevenson, Ltd., of Chicago (Richard L. Mandel and Jack K. Levin, of counsel), for appellants.

Brodl, Daugherty & Addison and Schmidt, DiMonte, Baker & Lizak, both of Chicago (Eugene A. DiMonte and Edward L. Daugherty, of counsel), for appellee.

Marvin Green, of Chicago, for cross-plaintiff-appellee.

Mr. JUSTICE BUA delivered the opinion of the court:

This is an appeal from an order of the Circuit Court of Cook County wherein Hines Lumber Company (Hines) and Des Plaines Lumber and Coal Company (Des Plaines) were decreed to have mechanic's liens against a certain apartment project.

On appeal, the defendants contend, *inter alia*, that the trial court erred in striking their defense under section 21 of the Mechanic's Lien Act (Ill. Rev. Stat. 1975, ch. 82, par. 21) and in reforming a certain lien waiver. The relevant facts follow.

In January 1972, construction began on an apartment and townhouse project commonly known as Runaway Bay (Project) located on a 20-acre site near Palatine, Illinois. The Project was constructed by Dell Corporation (Dell) under a written contract with the American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement 76129 (Trustee). The Project was financed primarily by an FHA insured mortgage. The contract between Trustee and Dell provided that Dell was to receive $200,950 as a builder's fee, evidenced by an unsecured, non-interest-bearing note of the Trustee, payable in 40 years. All documents filed with the FHA were standard form and delineate the Trustee as owner, and Dell as the original contractor. The principal shareholders and directors of Dell are Robert N. Sklare and Jerome P. O'Connor. The beneficiary of the land trust and the Project developer is the Woodbridge Way Development Company, an Illinois limited partnership. Dell and Messrs. Sklare and O'Connor are the general partners of the Woodbridge Way (Partnership) with a combined equity of 31.875%. Since the partnership had no employees of its own, all of its functions were handled by Dell's employees.

On April 11, 1972, Dell entered into a contract with Cal-Mar Construction Company (Cal-Mar) whereby Cal-Mar was to furnish labor and material for all of the rough carpentry and certain of the finished carpentry work on the Project. The contract price was for $1,015,705. Shortly thereafter, Cal-Mar sought to contract with Des Plaines for the supply of the material it would need. At the same time, Cal-Mar informed Des Plaines that in order to complete the Project it would need financial assistance. Thereafter, in exchange for Cal-Mar's promise that Des Plaines would be Cal-Mar's lumber supplier, and that Cal-Mar would obtain an agreement with Dell whereby all of Dell's payments to Cal-Mar would be made by check payable jointly to Des Plaines and Cal-Mar, Des Plaines agreed to co-sign Cal-Mar's notes with the Des Plaines National Bank, which in turn would advance money to Cal-Mar. Dell agreed to the conditions, and signed the Des Plaines joint check agreement on April 13, 1972. Cal-Mar then entered into an oral agreement with Des Plaines for the supply of necessary materials for use on the Project at the then prevailing fair market price. Pursuant to both their agreements with Cal-Mar and Dell, Des Plaines supplied materials as needed. They received payment for the material as follows: at the end of each month, Des Plaines would submit its lien waiver (using standard waiver forms) and invoice to Cal-Mar who would issue its check to Des Plaines for the invoice amount. Des Plaines would hold the check until Cal-Mar, using the Des Plaines waiver as part of its payment request to Dell, obtained Dell's check payable jointly to Cal-Mar and Des Plaines. Representatitives of both payees would then endorse the check and deposit it in Cal-Mar's account.

Des Plaines would then cash its check from Cal-Mar. This circuitous method of obtaining payment was necessitated by the fact that the check drawn by Dell contained additional funds due only Cal-Mar for labor costs.

Sometime in May 1972, Cal-Mar entered into an oral agreement with Hines to purchase additional lumber and materials for use on the Project. By July 1972, Hines had become alarmed at the amount of Cal-Mar's outstanding receivables and sought Dell's assistance in obtaining payment. Upon Des Plaines' assurance that they had no objections, Dell agreed to assist Hines. The parties then formulated a separate joint check method of payment, dissimilar from the Des Plaines method. Under the Hines-Dell payment method, Hines would present its lien waiver to Dell in return for Dell's trust receipt. As used in the trade, a trust receipt is a document whereby Dell, in consideration for the waiver, agreed to act as trustee for the benefit of Hines, to assure that Hines would be paid. After presenting its lien waiver to Dell and receiving Dell's trust receipt, Hines would submit its invoice to Cal-Mar. Cal-Mar would then apply to Dell for payment. Dell would issue its joint check payable to Hines and Cal-Mar. Cal-Mar would endorse the check, and deliver it to Hines, who in turn would deposit it and cancel the trust receipt. In any case where Dell did not issue its joint check, the waiver and trust receipt were to be returned.

On November 1, 1972, Cal-Mar invoiced Dell $83,956 for October's labor and materials. On November 4, 1972, after receiving Cal-Mar's check for $33,973.48, Des Plaines issued a lien waiver, in that amount, to Cal-Mar. Likewise, in November 1972, Hines issued lien waivers totalling $22,816 in exchange for Dell's trust receipt. On November 16, 1972, Cal-Mar submitted the aggregated Hines and Des Plaines waivers to Dell as partial support of its November invoice, together with its lien waiver and contractor's affidavit for $83,956. Following the agreed procedures, on November 22, 1972, Dell issued two joint checks, one payable to Des Plaines and Cal-Mar for $61,139.90, and the other payable to Hines and Cal-Mar for $22,816. However, unlike the procedure followed in previous months, Cal-Mar never endorsed and deposited the Des Plaines check nor endorsed and transferred the Hines check. Instead, Cal-Mar retained the checks in order to pay the government a $65,000 arrearage in withholding and social security taxes. The Internal Revenue Service, however, refused to accept the joint checks as tendered. On November 28, 1972, Cal-Mar's representatives returned the checks to Dell and, after explaining their difficulty with the IRS, requested that Dell reissue the checks payable solely to Cal-Mar. Dell refused to comply, voided the checks, and retained the funds. Cal-Mar then abandoned the Project and declared bankruptcy.

Despite Cal-Mar's abandonment, Dell continued to use Cal-Mar's

employees on the Project. Hines and Des Plaines, unaware of the abandonment, continued to supply material, which Dell accepted for payment in December. On November 29, 1972, Dell informed Des Plaines and Hines of Cal-Mar's actions and asked them to continue supplying material while Dell cleared up the contractual problems. Both companies refused. On December 1, 1972, the bank returned Cal-Mar's November 4 check (covering October materials) to Des Plaines marked "not sufficient funds." That same day Dell entered into a contract with its wholly owned subsidiary, Dell Realty (Realty), for the completion of the carpentry work on the Project. The original Dell/Realty contract, based upon Dell's estimate, called for completion at a cost of $748,000. Later, the contract price was increased to $1,020,976.15, of which $1,003,976.15 represented the estimated cost to complete the Dell/Cal-Mar contract. Final cost certifications showed that the actual cost of completion was $1,283,613.16 or $267,908.16 more than the Dell/Cal-Mar contract.

Subsequently, Hines filed a mechanic's lien complaint, joining all parties with an interest in the Project premises, including Des Plaines. Des Plaines filed an answer and counterclaim to enforce its mechanic's lien. Defendants Dell, Realty, and Trustee filed their affirmative defense under section 21 of the Mechanic's Lien Act (Ill. Rev. Stat. 1975, ch. 82, par. 21) alleging they were a single entity owner who had paid the contract in full and, therefore, were protected from paying more than the contract price to satisfy subcontractor's liens. On March 27, 1975, the trial court decreed that both Hines and Des Plaines were entitled to mechanic's liens against the Project premises in the amounts of $45,727 and $52,989.81 respectively, plus interest and costs. In addition, the court found, as summarized in pertinent part, as follows:

(1) that at all times material hereto the subject premises were owned by the American National Bank and Trust Company of Chicago, as Trustee, under Trust No. 76129;

(2) that all times material hereto Woodbridge Way Development Company was a limited partnership and the sole beneficiary of the aforesaid Trust;

(3) that Dell and Messrs. O'Connor and Sklare were both the general partners in Woodbridge and the principal shareholders and directors of Dell, and that each was authorized to and did act for Woodbridge with respect to its dealings with Dell as the *original contractor*;

(4) that Hines and Des Plaines delivered their various materials to the subject premises under separate oral agreements with defendant Cal-Mar; and that Cal-Mar was a carpentry *subcontractor* of Dell, the original contractor who contracted with the Owner-Trustee to construct the Project;

(5) that on or about July 15, 1972, for valid consideration Hines

entered into an oral joint check agreement with Dell as hereinbefore described, and that Hines would have ceased delivering materials at that time unless Dell would promise to pay Hines directly, via the joint check method;

(6) that both Hines and Des Plaines complied fully with all procedural requirements of Chapter 82 of the Illinois Revised Statutes in the prosecution of their respective causes of action;

(7) that the Owner-Trustee raised par. 21 of Chapter 82 of the Illinois Revised Statutes as a defense herein but did not sustain its burden of proof with respect to this defense because:

(a) The contract between Owner and Dell did not provide for a fair price for the improvements and constituted a fraud on subcontractors for the reason that the builder's fee was to be $200,950 payable 40 years after completion without interest, evidenced by an unsecured note of the Owner-Trustee, with no personal guarantee of payment, which note had a present value of approximately $9,500. A fair builder's fee would have been at least 10% of the construction cost or an amount of at least $549,911 which is 10% of the original contract price; that said builder's fee should be added to the contract price to arrive at a fair price for the original contract as provided by the said §21;

(b) The Owner-Trustee and Dell did not treat all subcontractors fairly and on the same basis because at the time that Hines and Des Plaines notified them of their respective claims, sums in excess of $4,000,000 were still due to be paid the contractor from the owner and thereafter all other subcontractors including Dell Realty, a subsidiary of Dell, were paid the said sums in excess of $4,000,000. The contracts of Dell Realty were modified from a stated price basis to a time and material basis after the filing of this suit to pay Dell Realty who completed the Cal-Mar carpentry substantial additional monies over and above the original contract between parent and subsidiary;

(c) The Owner-Trustee owed a duty to Hines and Des Plaines to complete the Cal-Mar contract for the lowest possible price and violated such duty by not even attempting to get competitive bids for the same and by permitting the modification of the Dell Realty contract as aforesaid;

(d) Des Plaines was listed on the Contractor's Statement to the Owner-Trustee and Dell for its full contract with Cal-Mar and that since on or about July 15, 1972 Dell and

Woodbridge and the Owner-Trustee had actual knowledge of the fact that Hines was supplying trusses and plywood under Hines Agreement with Cal-Mar and therefore did not rely on the Cal-Mar Sworn Statements as they knew that Hines was furnishing the trusses and plywood; and

(e) The Owner is still indebted to the contractor in the amount of $200,950.

(8) that the May 31, 1972, waiver of lien issued by Des Plaines and placed in evidence which purported to be a final waiver of lien was delivered by Des Plaines and accepted by defendants as a partial waiver of lien covering the amount due at the date of the waiver. The use of a final waiver of lien form was *a mutual mistake of the parties*. At no time did any of the parties treat the said waiver as final and at no time did the defendants rely on said waiver as final;

(9) that the Waiver of Lien of Des Plaines dated November 4, 1972 was ineffective in its entirety for lack of consideration in that the defendants did not pay Des Plaines or Cal-Mar for the same and in fact cancelled the check representing payment and had actual knowledge of the fact that Des Plaines was not paid and that Cal-Mar could not pay Des Plaines since Dell cancelled the check as aforesaid;

(10) that the equities of the case are with Hines and Des Plaines and against defendants and that the material allegations in Hines' Complaint and Des Plaines' Counterclaim have been proved and that the material allegations of the affirmative defenses of the defendants have not been proved;

(11) that Dell did not perform its agreement to pay Hines for deliveries although Hines performed everything required of it to be performed under its agreements with Cal-Mar and Dell including the delivery of materials as aforesaid and the delivery of waivers in exchange for a Trust Receipt signed by Dell. Hines delivered the aforedescribed materials in reliance upon the promise of Dell to make payments to Hines. Dell knew or should have known that Hines was relying on Dell's promise. Des Plaines performed everything required of it to be performed under its agreements;

(12) that the return of the November 22, 1972 joint checks to Dell by Cal-Mar and Dell's subsequent cancellation thereof were without the knowledge or permission of Hines or Des Plaines;

(13) that the failure of Dell to pay Hines or Des Plaines excused both of them from making further deliveries to the subject premises;

14) that at the time Cal-Mar left the subject premises the sum of $123,879 was due it on account of retentions and current approved payments; and that Cal-Mar left because of the difficulties with the Internal Revenue Service and not because of defects in workmanship, materials or any other difficulties between it and Dell or other defendants. (Emphasis added.)

The defendants initially contend herein that the trial court erred in finding that they do not comprise a single ownership entity. We do not agree.

■■ Section 1 of the Mechanic's Lien Act (Ill. Rev. Stat. 1975, ch. 82, par. 1) defines a contractor as one who contracts with the owner of a lot or tract of land to improve the lot or tract. *A fortiori*, the owner is one vested with legal title to the lot or tract of land. The evidence is undisputed that the legal title to the land on which the Project was erected was held by the Trustee, for the benefit of the Partnership. The Partnership was formed for the express purpose of erecting, operating and leasing the Project. A necessary incident thereto was acquisition of the land on which to build the Project. The Partnership chose to vest legal title to the property in the Trustee, with authority to contract for the construction of the Project. Illinois has long followed the rule that where, as here, land is held in trust, and the trustee has the authority to build upon and improve the land, then, for purposes of the Mechanic's Lien Act, the trustee is the owner. (*Taylor v. Gilsdorff* (1874), 74 Ill. 354; *Springer v. Kroeschell* (1896), 161 Ill. 358, 43 N.E. 1084.) While we note that there were certain incidents of ownership common to defendants Dell, Realty, and the Partnership, we see no merit in defendants' argument that this commonality of interest alone suffices to consolidate ownership in a single entity. Defendants' argument is even less persuasive in light of the fact that the Class A and Class B limited partners of the Partnership, who comprised approximately 68.125% of the equity of the Partnership, had no interest or control whatsoever in defendant corporations Dell or Realty. Moreover, both the original construction contract between the Trustee and Dell, as well as the FHA documents, specify the Trustee as owner and Dell as original contractor. Dell is further identified and treated as the contractor in the Dell/Cal-Mar contract (which specifies Cal-Mar as the carpentry *subcontractor*), the Dell/Realty contract, the contractor's sworn statements, and the certificates of costs. Based upon the record before us the trial court's finding on this issue is affirmed.

The defendants' next contend that the court erred in striking defendants' section 21 defenses under the Mechanic's Lien Act (Ill. Rev. Stat. 1975, ch. 82, par. 21).

Section 21 provides, in pertinent part, as follows:

"In no case, except as hereinafter provided, shall the *owner* be

compelled to pay a greater sum for or on account of the completion of such house, building or other improvement than the price or sum stipulated in said original contract or agreement, unless payment be made to the contractor or to his order, in violation of the rights and interests of the persons intended to be benefited by this act: Provided, if it shall appear to the court that the owner and contractor fraudulently, and for the purpose of defrauding sub-contractors fixed an unreasonably low price in their original contract for the erection or repairing of such house, building or other improvement, then the court shall ascertain how much of a difference exists between a fair price for labor and material used in said house, building or other improvement, and the sum named in said original contract, and said difference shall be considered a part of the contract and be subject to a lien. * * *" (Emphasis added.)

The trial court found that the Trustee-Owner and Dell fixed an unreasonably low price as a builder's fee in their original contract. Jerome O'Connor, general partner and principal shareholder of Dell, admitted on cross-examination that a fair builder's fee would have been at least 10% of the construction cost or $549,911 rather than the unsecured note for $200,950 payable in 40 years, with an approximate value of $9,500 at the time of trial. Accordingly, as provided by section 21, the court decreed the difference a part of the original contract and subject to a lien. Moreover, the court, further determined that the Trustee-Owner and Dell failed to treat all sub-contractors fairly and on the same basis. The evidence showed that at the time Hines and Des Plaines notified the owner and Dell of their lien claims as provided by section 27 of the Mechanic's Lien Act (Ill. Rev. Stat. 1975, ch. 82, par. 27), there was in excess of $4,000,000 due Dell from the owner. Thereafter, the owner not only voluntarily paid Dell, Realty and certain other subcontractors in excess of $4,000,000, but also allowed the Dell/Realty contract to be modified to pay substantial additional monies over the original contract. The evidence further showed that the owner still owes Dell $200,950 under the unsecured note and a $22,500 developer's fee.

Defendants now contend that the contracts as aforesaid did not constitute a fraud upon Hines and Des Plaines. And, further, that by amending the original contract to a fair price the court is compelling the owner to pay a greater sum than the price of the original contract, in contravention of section 21. We do not agree.

Section 21 protects an owner from paying a greater sum for the completion of a house, building or other improvement than the price stipulated in the original contract, unless payments be made to the contractor in violation of the rights and interests of subcontractors (see Ill.

Rev. Stat. 1975, ch. 82, par. 21). "Mechanic's liens are unknown to the common law, or to equity, and depend for their existence and enforcement on the statutes which create them; such statutes being in derogation of the common law are to be strictly construed: Armstrong v. Obucino (1921), 300 Ill. 140, 133 N.E. 58. This is true notwithstanding Section 39 of the Act which provides: 'This act is and shall be liberally construed as a remedial act'; North Side Sash and Door Co. v. Hecht et al (1920), 295 Ill. 515, 129 N.E. 273." (*D. D. Kennedy, Inc. v. Lake Petersburg Association* (1964), 54 Ill. App. 2d 85, 101, 203 N.E.2d 145, 152.) Therefore, since section 21 may protect the owner from paying a higher price than originally contracted, and having heretofore determined that defendants Dell, Realty, and Partnership are not the owners under the statute, the trial court was correct in striking their defenses under section 21 based upon their purported ownership status. Additionally, the record evinces a showing that the Owner-Trustee made payments to the contractor in violation of the rights and interests of Hines and Des Plaines in the amounts aforesaid. These payments were made despite Hines' and Des Plaines' notification of their lien claims to the owner of his agent and were, therefore, in violation of section 21 as well as section 27 of the Act which provides, in pertinent part as follows:

"When the owner or his agent is notified as provided in this act, he shall retain from any money due or to become due the contractor, an amount sufficient to pay all demands that are or will become due such sub-contractor, tradesman, materialmen, mechanic, or workman of whose claim he is notified, * * *.

Any payment made by the owner to the contractor after such notice, without retaining sufficient money to pay such claims, shall be considered illegal and made in violation of the rights of the laborers and sub-contractors and the rights of such laborers and sub-contractors to a lien shall not be affected there * * *."

■■ Such deliberate conduct on the part of the owner, as evidenced in its failing to retain sufficient funds to satisfy the subcontractors after notice, in fixing an unreasonably low contract price, and in paying certain subcontractor's claims over others was sufficient to support the trial court's conclusion that the Owner-Trustee made payments to the contractor in violation of the rights and interests of the persons intended to be benefited by the Act, and thereby lost the protection afforded by section 21. See *Krack Corp. v. Sky Valley Foods, Inc.* (1971), 133 Ill. App. 2d 469, 273 N.E.2d 202.

Defendants' further contend that the trial court erred in decreeing that the issuance of a final waiver of lien on May 31, 1972, by Des Plaines was a mistake and that the Des Plaines waiver of lien dated November 4, 1972, was ineffective in its entirety for lack of consideration. We will first

address ourselves to the issue presented concerning the May 31 waiver.

The facts, as hereinbefore setforth, describe the joint check agreement between Dell, Des Plaines, and Cal-Mar. In order to secure a payment for materials supplied, Des Plaines would issue a lien waiver to Cal-Mar and in return take Cal-Mar's check payable to them. Cal-Mar would then use the Des Plaines waiver to support part of its payment request to Dell. Dell, in reliance upon the waivers and the contractor's sworn statement would issue a check payable jointly to Des Plaines and Cal-Mar. On May 31, 1972, Des Plaines issued its waiver and received Cal-Mar's check. The waiver form used, however, recited on its face that it was a final waiver of lien. Defendants now urge this court to hold that since the waiver form used on May 31, 1972, was marked final on its face, Des Plaines has relinquished its right to enforce subsequent lien claims against them. We regard the defendants' argument as ill-founded.

■■■ It is undisputed that from May 31, 1972, until December 1972 Des Plaines issued partial waivers to Cal-Mar, and Dell, in return, issued its joint check upon receipt of the waivers and contractor's statements. It was not until the trial of the instant cause that defendants advanced their final waiver theory. The court below concluded that the use of the final waiver form was a mutual mistake, in light of the evidence presented that Des Plaines never intended to issue a final waiver and that none of the parties treated the waiver as final. The evidence at trial concerning the use of the final waiver form and the subsequent actions of the parties in reliance thereon was, at worst, ambiguous. "It has been held that in cases of ambiguity the doubt should be resolved against the waiver, since it should be presumed, in the absence of clear evidence to the contrary, that one has not disabled himself from the use of so valuable a privilege as that given by statute for the enforcement of builder's rights in the circumstances involved." (*Burgoyne v. Pyle* (1931), 261 Ill. App. 356, 369.) We see no clear evidence in the record upon which to support defendants' contention that Des Plaines effectively waived its lien rights under the statute. Accordingly, we affirm the judgment of the trial court thereon.

Next, defendants argue that the court erred in finding that the Des Plaines waiver of November 4, 1972, was wholly ineffective for lack of consideration. However, in light of the evidence, we need not decide that issue.

The evidence amply demonstrated that Des Plaines, following a building industry custom, issued its lien waiver to Cal-Mar before receiving payment. In exchange, as per industry custom, Cal-Mar issued a post-dated check to Dell. That Dell was aware of this custom in the industry is apparent by their use of a post-dated check to pay Cal-Mar in November 1972. Likewise, Dell was aware Des Plaines had not received payment for their November 4 waiver because Dell had not yet issued its

joint check to Cal-Mar and Des Plaines to assure that payment pursuant to their joint check agreement. Indeed, Dell admits that after issuing the joint check they voided it and retained the funds, their express agreement with Des Plaines notwithstanding.

■■ The issue then is not whether consideration was necessary to support the lien waiver. Rather the issue is whether Des Plaines, once having issued its lien waiver, may subsequently repudiate it and assert their claim. In light of the proof adduced as to the industry custom for lien waivers to be given before payment has been made, the defendants' knowledge and use of the aforesaid custom, and the express agreement of the parties to employ a joint check to assure Des Plaines' payment for material we hold that Des Plaines may repudiate their lien waiver. We note that there are no cases in Illinois directly on this point but we feel that our decision herein is in consonance with our Supreme Court's rulings in analogous situations. See specifically *Chicago Bridge & Iron Co. v. Reliance Insurance Co.* (1970), 46 Ill. 2d 522, 264 N.E.2d 134; and also *Prepakt Concrete Co. v. Fidelity & Deposit Co.* (7th Cir. 1968), 393 F.2d 187.

Finally defendants contend that the court below erred in decreeing that the Dell-Hines joint check agreement constituted a promise to pay Hines directly. Defendants contend that Hines failed to prove a clear and unambiguous promise of Dell to pay Hines directly, as required under the law of promissory estoppel. However, we need not decide whether or not Hines may assert its lien claim under the doctrine of promissory estoppel. In light of the defendants' admissions that Dell was to return Hines' waiver and cancel the trust receipts in any case where Dell did not issue its joint check, that Dell failed to do this and in fact voided the check and retained the funds owed Hines, there can be no question but that Hines' claim to the funds still owing under the contract as amended is valid.

For the foregoing reasons the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.