NOTICE
Decision filed 04/18/19. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2019 IL App (5th) 170316

NO. 5-17-0316

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MORMAT ELECTRICAL & CONSTRUCTION SERVICES, LLC, | ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-L-197 |
| HUNTER CONSTRUCTION SERVICES, INC., | ) ) ) | Honorable Christopher T. Kolker, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Welch and Chapman concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Mormat Electrical & Construction Services, LLC (Mormat), an Illinois limited liability company, brought suit against defendant, Hunter Construction Services, Inc. (Hunter), an Illinois corporation, for breach of an oral contract related to electrical services performed during the construction of a Buffalo Wild Wings restaurant in Dickinson, North Dakota. After a bench trial in the circuit court of St. Clair County on December 20, 2016, the trial court ruled in favor of Mormat and awarded Mormat the principal sum of $59,400 plus interest. Hunter appeals contending the court did not properly interpret the oral contract between Mormat and Hunter and erred in awarding Mormat $58,000 of the total sum due under the contract. Hunter also contends

1

the court erred in disregarding a November 21, 2014, unconditional lien waiver and release. We affirm.

¶ 2    The evidence reveals that in July 2014, Hunter entered into a general contract to construct a Buffalo Wild Wings restaurant in Dickinson, North Dakota. Hunter, owned by Hunter Yung and his wife, had built 14 similar stand-alone Buffalo Wild Wings prior to the North Dakota project. After receiving a contract from the owner of the Buffalo Wild Wings project, Hunter advised the electrical subcontractor he originally had chosen that the project was ready to proceed. The subcontractor unfortunately backed out of the bid. At this point, Hunter reached out to Mormat, owned by Christopher Carney and his wife, Denise, to see if Mormat could perform the electrical work for the restaurant. Mormat had worked on other Buffalo Wild Wing projects and understood the general scope and labor requirements even though this particular project was a little larger than most. Mormat agreed, and Hunter entered into an oral subcontract with Mormat for the electrical work. The electrical budget, per the general contract for the electrical scope of work, was $135,000. Under the contract, Mormat was responsible for all the electrical labor and wiring over 120 volts, including the wiring and installation of all light fittings and fixtures as well as all equipment connections related to heating and cooling, kitchen appliances, and mechanical equipment. In order to timely perform, the expected scope of work necessitated a four to five man electrical crew.

¶ 3    Prior to entering into the oral contract, Mormat, a nonunion contractor, informed Hunter it could not acquire a North Dakota electrical permit because it did not employ an electrician capable of being licensed in North Dakota. Hunter and Mormat agreed that a local contractor would be needed to pull the necessary electrical permits, perform inspections, and be on site throughout the project. Integrity Electrical, owned by Brandon Dimmick, a licensed North

2

Dakota electrician, was hired on a time and material basis to provide the electrical permit and supervision for the project to meet North Dakota code requirements. Integrity was paid directly by Hunter.

¶ 4    In early August 2014, the electrical work began on the restaurant. Both Mormat and Integrity had two electricians on site. After some issues arose on the job, however, Integrity pulled its permit. For an extended period of time, little electrical work was done. During this "shut down," Hunter directed Mormat to work at night or at times when inspectors were not present. Eventually Integrity came back to the job. By the end of the project, Integrity had submitted 10 invoices covering one to two employees for services between August 22 and December 8, 2014, totaling approximately $72,715. No back-charge was tendered to Mormat for Integrity's work.

¶ 5    By the time Integrity returned to the project, the job was significantly behind schedule. Mormat worked overtime in order to help get the project completed and performed substantial extra work beyond its original scope. Some of the items included extra labor and materials for installation of a fire alarm, trenching for electrical wire, carpentry work, and correcting others' work, in addition to extra costs incurred during the downtime when the permit was pulled, all of which increased Mormat's overhead. While Integrity performed some of Mormat's base contract work, the cost savings compared to Mormat's extra work was, according to Mormat, a wash. Mormat performed and completed its work on the project during the period of August 1, 2014, through December 8, 2014. Mormat submitted invoices to Hunter totaling $145,731.25 of which Hunter paid Mormat $77,000. Given that the contract price was $135,000, Mormat believed it was owed $58,000, even though the difference was in fact higher. Hunter did admit that Mormat was entitled to an additional $1400 for materials for a low voltage fire alarm, which is not a part

3

of this appeal, but otherwise did not believe Mormat was entitled to any additional monies. Rather, Hunter claimed a right of setoff or credit for work performed within the scope of the subcontract by other electricians.

¶ 6    The trial court ultimately held that the electrical subcontract did not include the costs of Integrity's work, consequently the costs associated with Integrity were not chargeable against the $135,000 contract price and Mormat was not responsible for Integrity's expenses. The court therefore awarded Mormat $58,000 that was still due under the oral contract, plus interest.

¶ 7    Hunter argues on appeal that the trial court erred in interpreting the oral subcontract between Hunter and Mormat to exclude any labor and materials for electrical services provided by Integrity that were within the scope of the electrical subcontract. Hunter points out the court failed to assess whether Mormat fully performed under the contract and further failed to issue Hunter a credit for Mormat's partial performance. Additionally, Hunter contends the trial court failed to acknowledge the effect of the unconditional lien waiver, dated November 19, 2014, and signed by Mormat.

¶ 8    Generally the construction or interpretation of a contract is a matter to be determined by the trial court as a question of law with *de novo* review by this court. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005). When an oral contract is involved, however, the standard of review is different because the trial court is required to observe the conduct and determine the credibility of the witnesses when making findings of fact about the existence and terms of an oral contract (see *Emmenegger Construction Co. v. King*, 103 Ill. App. 3d 423, 427 (1982)). The intent of the parties to an oral contract is determined by the trier of fact, and a reviewing court should not set aside the trial court's findings unless they are contrary to the manifest weight of the evidence. *Ceres Illinois, Inc. v. Illinois Scrap*

4

*Processing, Inc.*, 114 Ill. 2d 133, 141 (1986). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Ceres Illinois*, 114 Ill. 2d at 142.

¶ 9    It is clear from the evidence presented that Mormat agreed to provide all labor and material needed for the electrical wiring for the restaurant project. It is also clear that the parties understood that Mormat could not perform all of the electrical work under the contract because Mormat did not have an employee who was licensed in North Dakota who could obtain the necessary permits. Hunter agreed to provide the permit and supervision at Hunter's own cost, and never back-charged Mormat for any of the expenses associated with Integrity, the subcontractor who could obtain the necessary permits. The testimony revealed that neither Mormat nor Integrity believed or were informed that Integrity was working for Mormat or that the two companies were somehow in a joint venture. We note that it is impossible to form a joint venture without the joint venture's partners having actual knowledge and intent to form such an enterprise. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 843 (1992). Hunter maintains still that it is entitled to a credit against the contract for the electrical work that Integrity performed on the project in place of Mormat. See *Royal Ornamental Iron, Inc. v. Devon Bank*, 32 Ill. App. 3d 101, 108 (1975). While it is true that Integrity and other electricians provided some portion of the original scope of Mormat's contracted-for work, Mormat also provided additional services to Hunter beyond the original scope of the work, including carpentry services while the job was shut down for lack of an electrical permit. As the trial court concluded, the expenses incurred because Hunter hired Integrity cannot be charged against Mormat's contract. To do so would be shifting the risk of expenses from Hunter to Mormat beyond any reasonable interpretation of their contractual relationship.

5

¶ 10   Hunter counters that Mormat signed an unconditional waiver and release for all labor and materials through November 19, 2014, in consideration for another payment of $10,000. Hunter points out that when a written release is clear and explicit, the court must enforce the release as written, with the meaning and intention of the parties being gathered from the face of the document. *First National Bank of Geneva v. Lively*, 211 Ill. App. 3d 1, 4 (1991). According to Hunter, the court erred in disregarding the language of the unconditional lien waiver and release and therefore should not have awarded Mormat any additional monies on the contract. The court determined, however, that neither party thought that the signing of the waiver and release documents had the effect of preventing Mormat from getting paid what it was still owed on the oral contract. And, even if the November waiver were to be construed as a full release, then there was a mutual mistake of fact as to the idea that it would release Hunter from paying Mormat or that Mormat was waiving any amounts still owed under the contract. We agree.

¶ 11   General contractors routinely require execution of lien waivers in order for payments to be processed. See *Edward Hines Lumber Co. v. Dell Corp.*, 49 Ill. App. 3d 873, 883-84 (1977). Such was the practice in this instance. Mormat signed a series of dated lien waivers and releases during the course of the project in order to be paid. In fact, Hunter required Mormat to sign lien waivers to get paid, which in turn allowed Hunter to get paid on the original construction contract, and allowed the restaurant to get opened. Even though the lien waivers claimed all amounts owing up to the signature date had been paid, that certainly was not true in this instance. The evidence revealed that neither party thought that signing the documents had the effect of preventing Mormat from getting paid what was owed on the oral contract.

¶ 12   Hunter points out that the November unconditional lien waiver at issue here specifically waived and released "any and all *** claims against the Project, Owner, Surety, Lender, if any,

6

and any other parties who have an interest in the Project and any other individual or entity, for such labor, skills, equipment, tools, supplies, services or associated items furnished prior to and including the 19th day of November, 2014." Mormat had not received any payment on the contract for several weeks at this point and substantial monies were owed to Mormat. There was no testimony adduced to indicate that Mormat intended to release or waive payment of the remainder of the funds due to Mormat for work and materials already provided for the project. In fact, as Denise Carney testified on behalf of Mormat, when asked:

> "Q. And was there ever any discussion with you and brought to your attention that if you signed a lien waiver you would somehow be giving up your rights to get paid for the rest of your work?
>
> A. No, and they—they were well aware that this was for payouts and they owed additional amounts."

The only reason Mormat signed the November lien waiver was because Hunter represented that, in order to get paid any monies, the waiver had to be signed. The evidence also revealed that Hunter requested additional funds to pay Mormat for electrical work after the lien waiver had been signed, and Mormat still had men on site working at the time of signing. We agree with the trial court that neither party thought that the signing of the waiver and release documents had the effect of preventing Mormat from getting paid what it was still owed on the oral contract.

¶ 13    Mormat performed the work requested of it under the oral contract, performed substantial additional work, worked overtime, and completed the project, despite delays that were not Mormat's fault. After taking all of this into consideration while weighing the credibility of the witnesses, the trial court entered judgment in favor of Mormat for $59,400 plus interest, the amount still owed under the oral subcontract plus the additional materials that Hunter

7

acknowledged were due. Under the circumstances presented, the court's determination was not against the manifest weight of the evidence.

¶ 14    For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County.


¶ 15    Affirmed.

2019 IL App (5th) 170316

NO. 5-17-0316

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

MORMAT ELECTRICAL & CONSTRUCTION SERVICES, LLC,

   Plaintiff-Appellee,

v.

HUNTER CONSTRUCTION SERVICES, INC.,

   Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the
Circuit Court of
St. Clair County.


No. 15-L-197


Honorable
Christopher T. Kolker,
Judge, presiding.

_____

**Opinion Filed:**   April 18, 2019

_____

**Justices:**   Honorable Judy L. Cates, J.

        Honorable Thomas M. Welch, J., and
        Honorable Melissa A. Chapman, J.
        Concur

_____

**Attorney**
**for**
**Appellant**
   Daniel C. Lytle, HeplerBroom LLC, 130 North Main Street,
   P.O. Box 510, Edwardsville, IL 62025-0510

_____

**Attorneys**
**for**
**Appellee**
   Roger W. Pecha, Laura M. Robb, Jenkins & Kling, P.C., 150 North
   Meramec Avenue, Suite 400, St. Louis, MO 63105

_____