ARNOLD MILLER, d/b/a Miller Roof Company, Plaintiff-Appellee, *v.* RACINE TRUST *et al.*, Defendants-Appellants.

First District (1st Division)  No. 77-706

Opinion filed September 18, 1978.

Merwin Rosenberg, Robert B. Terry, and Lane & Terry, all of Wilmette, for appellants.

Kwiatt & Silverman, Ltd., of Chicago (Michael Silverman and Stephen E. Ford, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Arnold Miller, d/b/a Miller Roof Company, entered into a contract with defendant, Racine Trust, to repair for $22,875 a leaking roof on a building owned by defendant in Racine, Wisconsin. Despite the repair work, the roof continued to leak and defendant refused to pay. Plaintiff, alleging full performance by him, filed suit against defendant and Louis Terry and Sheldon Terry, trustees of the defendant Racine Trust, seeking $23,050, the contract price plus an additional $275 as an agreed extra. Defendants answered the amended complaint, denying performance by plaintiff. Defendant Racine Trust filed a counterclaim alleging that, despite an express warranty that the roof would be leakproof for 18 months, the roof continued to leak and that Racine Trust will be required to complete the roofing work promised by plaintiff at a cost

of $50,000. After a bench trial, judgment for $17,500 was entered for plaintiff against all three defendants and judgment was entered against defendant Racine Trust on its counterclaim. Defendants appeal, contending that the trial court erred in denying their motion to dismiss at the end of plaintiff's case, the findings and judgment against defendants are against the manifest weight of the evidence, and the court erred in excluding certain evidence. Defendants Louis Terry and Sheldon Terry also contend that they were not liable individually. There is no appeal by defendant Racine Trust from the judgment against it on its counterclaim.

Racine Trust, of which Sheldon Terry and Louis Terry were trustees, owned a building in Racine, Wisconsin, two of whose tenants were a Zayre store and a Piggly-Wiggly store. The roof of the building, which was several years old, had developed leaks. Plaintiff, who had done work for the Terrys on another store in Chicago, met with them in August 1973. After plaintiff had examined the roof on the Racine building, he agreed to give an 18-months warranty on his work and submitted his form contract to the Terrys, which they rejected. At another meeting held shortly thereafter, Louis Terry's secretary drew up a contract, using the form contract which plaintiff had submitted. The Terrys testified that the contract consisted of two pages. Plaintiff testified, and the trial court so found, that there was a third page, which contained the conditions set out on the reverse side of his form contract and that certain of the conditions had been stricken by the Terrys.

The contract, which was signed by the parties on September 17, 1973, provided:

"I. It is understood that the present roof leaks are to be permanently repaired to include (but not limited to) the following items:

1) Completely broom sweep roof.

2) Repair and permanently caulk vitrious tile coping so as to be waterproof. Any loose tile shall be permanently cemented back in.

3) Cap all flashings with asphalt membrane.

4) Coat all parapet walls to include covering flashings.

5) Break bubbles, repair with new felt and mop down.

6) Replace all rotted, torn roof covering (tar paper or felt) as needed before new coat of asphalt is applied.

7) Waterproof and coat stack vents.

8) Waterproof and coat all metal air-conditioning housings where they meet the roof surface to insure they do not leak.

9) Replace felt or roof decking where necessary.

10) Cap gutters to prevent water back-up.

11) Final coating of Perma-Seal applied at 250 degrees sprayed under 300 lbs. of pressure.

12) Respread all roof gravel at finish of job.

II. The full price for this contract (including all labor and material) and all other costs involved shall be $30,000. Payment shall be made within 10 days from date of completion.

Price quoted is complete and no extras will be paid unless authorized by the Racine Trust in writing.

III. Miller Company warranties, without reservation, that the material and workmanship provided for these repairs shall result in a leak-proof roof for the period of 18 months from the completion of this work. Miller Company shall evidence the completion of such work in writing so that the period of 18 months Warranty shall be noted.

In the event that the roof shall need repair or correction during the Warranty period, as determined by the Racine Trust, Miller Company shall make full and complete necessary repairs within 15 days of notification. In the event that such repairs are not made by Miller Company, then the Racine Trust shall have the right to hire other contractors to make the necessary repairs and all such costs shall be refunded by the Miller Company.

IV. The roof repair covered by this contract shall be completed within thirty days from acceptance of this contract. Weather permitting.

V. Miller Company guarantees that they are fully insured by workmen's compensation and public liability to protect the Racine Trust from any and all claims. Certificates of Insurance are to be supplied to the Racine Trust.

ACCEPTED BY:

MILLER ROOF COMPANY
2318 BELMONT AVENUE
CHICAGO, ILLINOIS, 60614

Dated: September 17, 1973

By  s/A. Miller
    A. Miller

ACCEPTED BY:

RACINE TRUST
834 WEST 63RD STREET
CHICAGO, ILLINOIS, 60621

By  s/ Louis Terry
    Louis Terry, Trustee

## CONDITIONS

The parties intend to be legally bound hereby and to be governed by law upon the execution of this instrument as a contract. In the event that the Buyer issues his own purchase order or prepares a contract based on this proposal, the conditions contained herein shall be deemed to be incorporated in the said purchase order or contract unless exception is specifically taken thereto.

Changes, additions or deductions in the plans and specifications or the work to be done must be agreed to in writing by us before any additional work is performed or any credit allowed for deductions.

You agree to carry or cause to be carried proper fire and extended coverage insurance on the premises to protect us against loss through destruction of partially completed work until the job is completed and accepted by you.

We will not be responsible for delay or damage caused by strikes, fires, floods, accidents or other causes and contingencies beyond our control.

We are not to be liable for any damage to building or contents thereof, resulting from rains, snows or other weather conditions existing, nor for damage to our materials caused by structural changes in the building at any time.

This proposal is limited to acceptance within fifteen (15) days from the date hereof and is subject to conditions stated herein.

Should any legal action have to be taken to collect the contract price of the job the guarantee shall become null and void and all legal expenses shall be assumed by customer. The unpaid balance after the due date of contract shall bear the interest rate of 2% per month on unpaid balance plus all lawyer fees and court costs."

Subsequently, the repairs to the roof over the Piggly-Wiggly store were eliminated and the contract price was reduced to $22,875.

After the plaintiff had done the repair work on the roof, the roof still leaked and plaintiff was so notified on October 31 and November 7, 1973.

On November 10, 1973, plaintiff sent notice to the Terrys that the repairs had been completed, asked for payment within 10 days, and stated that the guarantee would run for 18 months from that date. On November 15 and November 28 plaintiff was again notified of leaks. In December plaintiff inspected the roof and observed leaking during inclement weather, but said that repairs could not be made until the following spring.

In the spring of 1974 plaintiff did further work on the roof, but it continued to leak. Plaintiff testified that although he was notified of the leaks after he had finished his further repairs in the spring of 1974, "my

feeling was that I didn't want to spend any more money on the job because we never received any money on the job." On July 15, 1974, plaintiff notified the Terrys that work was completed after further repairs and asked for payment. Payment was refused on the ground that the roof still leaked.

Plaintiff's expert, Eugene J. McCormick, testified that he inspected the roof on June 4, 1975, and that it was not leakproof on that date. In the report which he submitted to plaintiff, he stated that the roof was leaking on that date and had been leaking prior to that date.

Carl Hansen, an independent roofing consultant, testified for defendants that he had inspected the roof on October 9, 1974, and his visual observations on that date indicated that the roof was not leakproof.

Sheldon Terry testified that he visited the store after receiving complaints from Zayre employees and observed leaks in the interior of the store in November and December of 1973, January or February 1974, April 1974, July 1974 (both before and after July 15), August 1974 and within 60 days thereafter, March 1975 and within 60 days prior to July 23, 1975. One leak in the overhang in the vestibule of the store which he considered part of the work to be done under the contract was eliminated, although the elimination of this leak may have been an extra. Louis Terry also testified to the leaks.

The Terrys hired another roofing repair service to remedy the leaks. That contract was dated July 23, 1975. Work was commenced approximately September 2, 1975. There were still leaks in the store late in 1975.

Three employees of the Zayre store testified concerning the leaks they observed after the commencement of their employment at the store. One or more of them testified as to leaks in April or May 1974, August and September 1974, the fall of 1974, Christmas of 1974, and the winter and spring of 1975. Some of the leaks were so severe that tarpaulins had to be draped to catch the water and protect the store contents; large buckets and containers were used. On two separate occasions, one employee had to stay overnight to empty the buckets because they were being filled with water from the leaks. These leaks occurred during times of rain or after thawing of snow on the roof. They stopped in the summer of 1976.

The trial court found that, although there might have been some exceptions, all of the 12 items listed in the contract had been substantially complied with and that plaintiff did the work that purports to be in the contract. The trial court also found:

"Defendants did complain thereafter and that there was a series of correspondence from Defendant to Plaintiff and that as a result of these complaints of the leaks, that some of the leaks apparently had been in existence were corrected and other leaks either continued

to persist or there were new leaks that came about from the roof or someplace from the structure, whether it be as a result of the coping or other places, but nevertheless, the water came into the Zayre Department Store at several different places. * * * [A]s a result of the written and oral complaints and the communications by telephone or oral or otherwise, that the Plaintiff did agree and did in fact return to the site to attempt to correct that which apparently continued to cause leaks. * * * [T]his was accomplished on or about July or shortly thereabouts of 1974. * * * [S]ubsequent to the completion of the contract or at least what Mr. Plaintiff thinks he had done everything having gone out on July of 1974 or the early part of June and thereafter billing that nothing was tendered subsequent to July, I think, 24, 1974 by way of oral or written complaint to the Plaintiff thereafter as to the status of the work with respect to leaks. * * * [O]n the basis of the testimony of the Defendants and the three witnesses from the Zayre Department Store that leaks did occur subsequent thereto, although the Court in some instances is not certain whether these leaks are all pre-existing or new. * * * [W]hile they [the experts] both saw the roof subsequent to the work that was accomplished, the Court finds that basically there was a two-fold defect in the roof that was the result of construction, the original construction, and interspersed by time and wind and weather factors which caused the building proper and the roof to be somewhat slightly apart and that the construction of the roof drainage was somewhat lacking. * * * While the contract does expressly state 18-month guarantee, the Court finds that after the work was finished sometime in I think it would have been in September or October, that a fair trial would have been during the winter. * * * [T]o do that which might or could be related to the existing leaks—and I've indicated I don't really know from the evidence what they were, but there were leaks—that the parties were in contact with one another and that the first reasonable opportunity for the Plaintiff to attempt to remedy, whether they be the prior-existing or new leaks, was to go out there in July; and it is acknowledged by all the parties that he was there, and he did some work and patch work. * * * [T]he Plaintiff performed the terms of the contract in a good and workmanlike manner. * * * [T]he issues preponderate by the greater weight of the evidence in favor of the Plaintiff. * * * [W]hile there are some matters that the Plaintiff hasn't fully complied with, as to all matters, he substantially complied with them. Therefore, the Court in considering the question of services and damages here considers all of the factors and, therefore, allows

certain credits to the Defendant; and before he does that, he wants to say this: With respect to the Counterclaim, I've looked at it. Because of the findings of * * * the issues for the Plaintiff and because of the factor of no showing of any damages and because of lack of proof, there will be a finding for the Counter-Defendant on the Counterclaim; and on the Complaint, there will be a judgment for the Plaintiff in the sum of $17,500, at [*sic*] cost."

■■ Defendants contend that the trial court erred in denying their motion to dismiss at the close of plaintiff's case. This contention need not be considered because the introduction of evidence by defendants after the denial of their motion constitutes a waiver of the motion. Section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 64(3)); *Brady Brick & Supply Co. v. Lotito* (1976), 43 Ill. App. 3d 69, 356 N.E.2d 1126.

Defendants also contend that the finding and judgment against them were against the manifest weight of the evidence. We agree.

The sole purpose of the contract was to make the roof leak-proof. The contract provided: "It is understood that the present roof leaks are to be permanently repaired. * * * Miller Company warranties, without reservation, that the material and workmanship provided for those repairs shall result in a leak-proof roof for the period of 18 months from the completion of this work." By attempting, after having given notice on November 15, 1973, that the work was completed, to make further repairs to stop the leaks in the spring and early summer of 1974, plaintiff acknowledged that the sole purpose of the contract was a leak-proof roof. On July 15, 1974, plaintiff gave further notice that the work was completed in order to start the running of the 18-month warranty.

The evidence is overwhelming that a leak-proof roof was never obtained by plaintiff. Defendants' expert testified that on October 9, 1974, the roof was not leak-proof. Plaintiff's own expert testified that the roof was not leak-proof on June 4, 1975. Defendants Louis Terry and Sheldon Terry testified to substantial leaks as late as July 23, 1975, before a new roofer was engaged to repair the roof. Three employees of the Zayre Store testified to the leaks and their severity until the summer of 1976. Plaintiff's testimony that he "didn't want to spend any money on the job because we never received any money on the job" is an admission that a leak-proof roof had not been obtained. The trial court itself found that there were still leaks.

The terms of the contract agreed to by plaintiff were in his form contract. The court's observation in *Kusy v. Johnson* (1976), 41 Ill. App. 3d 763, 766, 354 N.E.2d 480, is applicable here:

"* * * We do not accept the contention that a total failure on the part of a building contractor to comply with one of the

requirements of written specifications he himself supplied, can in any circumstances, be justly deemed a substantial performance."

■■ After a careful consideration of the evidence, we find that the trial court's finding of substantial compliance is against the manifest weight of the evidence.

■■ Plaintiff argues that because defendants made no payments to plaintiff he did not have to comply with the warranty provisions of the contract and was excused from further performance. The argument is ill-founded. Where the sole purpose of a contract is a leak-proof roof, failure to attain that purpose raises no obligation of payment. Contracts are generally interpreted to require that performance precede payment because, as here, performance and payment covenants are dependent, performance in accordance with the actual intention of the parties being precedent to payment.

In support of his contention that he was excused from the obligation to fulfill his explicit warranty, plaintiff relies on *Brady Brick & Supply Co. v. Lotito* (1976), 43 Ill. App. 3d 69, 356 N.E.2d 1126. That case is inapplicable because the contract there did not contain a specific, explicit warranty as did the contract here and, further, it required installment payments, not one total payment after the work was completed. In addition, if applicable, recovery is only for the value of the work already performed; it is not for the full contract price as plaintiff sought here.

Other cases relied on by plaintiff are also factually inapplicable.

■■ ■ Although the trial court's finding of substantial compliance by plaintiff was against the manifest weight of the evidence, we hold that plaintiff is entitled to a recovery for the value of his labor and material. The record here is devoid of any evidence (other than the contract) of the value of plaintiff's services and materials. Although the court in granting judgment for plaintiff stated that he was allowing defendants certain credits, there is nothing in the record from which it can be determined the items for which defendants were given credit and how the court concluded that their value to defendants was $5550, the difference between plaintiff's *ad damnum* of $23,050 and the judgment of $17,500. Consequently, the cause must be remanded for a new trial on the question of damages. There will be no need to amend the complaint further. *Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 342 N.E.2d 758.

Defendants also contend that they were improperly denied the right to impeach plaintiff, in that the court erroneously refused to allow them to examine Carl Hansen as to any report he made to plaintiff concerning the roof.

■■ In answer to interrogatories, plaintiff stated that Eugene J.

McCormick was the only expert he employed to inspect or examine the roof. Carl Hansen, called by defendants, testified that he was retained by plaintiff to inspect and examine the roof. He examined the roof on October 9, 1974, took 31 photographs and made a report. He reported both to plaintiff and to plaintiff's attorney verbally. He testified at length under questioning by the attorneys for both parties as to what he found on his inspection and identified the photographs and what they depicted. In view of this, we are unable to see how defendants were prejudiced by their inability to examine Hansen on the details of any report he had made. Everything he had found from his examination for plaintiff was brought out in his testimony and the trial court was fully aware of all matters which might affect plaintiff's credibility.

Louis Terry and Sheldon Terry separately contend that the trial court erroneously entered judgment against them individually. We agree.

■■ Louis Terry signed the contract in a form which properly and ordinarily would indicate that he signed in a representative capacity and did not intend to bind himself. (*Royal L. Brockob Construction Co. v. Trust Company of Chicago* (1955), 6 Ill. App. 2d 565, 128 N.E.2d 620; see Ill. Ann. Stat., ch. 26, par. 3—403, U.C.C. Comment, at 223-24 (Smith-Hurd 1963).) However, " '* * * if the contract is entered into by a trustee in a form and under circumstances not sufficiently negativing personal liability, the trustee becomes personally bound because he has no principal or, rather, because he is the principal himself.' " (*Brockob Construction Co. v. Trust Company of Chicago* (1955), 6 Ill. App. 2d 565, 569, 128 N.E.2d 620, 622.) This is so because a trust asset is only a *res*; the trustees own the legal title to the *res* for the benefit of the trust beneficiaries. Therefore, a trustee "* * * in a contract with third persons binds himself personally, unless he exacts an agreement from the person with whom he contracts to look to the funds of the estate exclusively * * *." (*Austin v. Parker* (1925), 317 Ill. 348, 354, 148 N.E. 19, 22.) However, where it clearly appears that the contract is made for the benefit of the trust assets, and payment is to be made out of the trust funds, and the trustee was acting within his capacity and authority as such in entering the contract, the trust will be bound but not the trustee personally. (*Empire Fire Proofing Co. v. Comstock* (1905), 121 Ill. App. 518, 526-27; *Smith v. Reisch* (1946), 329 Ill. App. 45, 67 N.E.2d 304; *Woerter v. Mahler* (1942), 314 Ill. App. 324, 41 N.E.2d 230.) Here, there was no evidence of any reliance by plaintiff on the ability of Louis Terry personally to pay for the repairs. The repairs were performed on the building which was the principal asset of the trust and there is no evidence that the trust assets are insufficient to satisfy the liability. As was stated in *Empire Fire Proofing Co. v. Comstock* (1905), 121 Ill. App. 518, 527: "If the plaintiff was unwilling to accept the fund as security for its

payment, [he] should have insisted upon a personal contract with the parties acting on behalf of the fund." It was error to enter judgment against Louis Terry.

■■ It was also erroneous to enter judgment against Sheldon Terry, who was not mentioned in the contract in any capacity, and who did not sign the contract. Since he did not agree to pay plaintiff anything, he cannot have breached an agreement to pay. *Northwestern Military & Naval Academy v. Wadleigh* (1932), 267 Ill. App. 1, 8.

Accordingly, the judgment against defendants Louis Terry and Sheldon Terry is reversed; the judgment for $17,500 in favor of plaintiff and against defendant Racine Trust is also reversed and in that regard the cause is remanded with directions that the trial court determine the fair and reasonable value of labor and material furnished by plaintiff and enter judgment accordingly for plaintiff and against defendant Racine Trust.

Reversed in part and reversed and remanded in part.

GOLDBERG, P. J., and McGLOON, J., concur.