LUCZAK BROTHERS, INC., Plaintiff-Appellee, *v.* TASKER GENERES *et al.*, Defendants-Appellants—(Scarlet Glow Engineering, Plaintiff-Appellee and Cross-Appellant).

First District (5th Division)   No. 82—1838

Opinion filed June 3, 1983.—Rehearing denied August 1, 1983.

Richard H. Kane, of Chicago, for appellants.

Demling & Eckhardt, of Glen Ellyn (John W. Demling, of counsel), for appellee Scarlet Glow Engineering.

Fox and Grove, Chartered, of Chicago (Russell M. Kofoed and Steven P. Cohn, of counsel), for appellee Luczak Brothers, Inc.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from judgments for plaintiffs Luczak Brothers, Inc. (Luczak), and Scarlet Glow Engineering Company (Scarlet Glow) on their counterclaims for foreclosure of mechanics' liens. Defendants Tasker and Dorothy Generes (Generes) contend that (1) the trial court erred as a matter of law in finding (a) that the counterclaims were not barred either by notice of waiver of lien provisions contained in the general contract or by the subcontracts of Luczak and Scarlet Glow and (b) that Luczak's counterclaim was not barred by its tender of a final waiver of lien; and (2) the court's finding that Luczak and Scarlet Glow substantially performed their subcontracts is against the manifest weight of the evidence. Scarlet Glow cross-appeals from those portions of the orders which limit the amount of its lien to $2,380 and find that it failed to prove its claim for conversion against Paul H. Bach, president of Structon Corporation (Structon).

On January 31, 1978, Structon and Generes entered into a general contract which provided that Structon would build a single-family residence in Northbrook, Illinois, on property owned by Generes. That document consisted of nine pages, the first three of which were recorded with the recorder of deeds of Cook County on April 3, 1978. Among the recorded provisions was a paragraph which incorporated by reference the American Institute of Architects Document A—201 General Conditions (the AIA document), which provides in pertinent part:

> "5.3.1 All work performed for the Contractor by a Subcontractor shall be pursuant to an appropriate agreement between the Contractor and the Subcontractor *** which shall contain provisions that:
>
> 1. preserve and protect the rights of the Owner and the Ar-

chitect under the Contract with respect to the Work to be performed under the subcontract so that the subcontracting thereof will not prejudice such rights;

2. require that such Work be performed in accordance with the requirements of the Contract Documents;

* * *

4. obligate each Subcontractor specifically to consent to the provisions of this Paragraph 5.3.

* * *

9.3.3 The Contractor warrants and guarantees that title to all Work, materials and equipment covered by an Application for Payment, whether incorporated in the Project or not, will pass to the Owner upon the receipt of such payment by the Contractor, free and clear of all liens, claims, security interests or encumbrances, hereinafter referred to in this Article 9 as 'liens'; and that no Work, materials or equipment covered by an Application for Payment will have been acquired by the Contractor; or by any other person performing the Work at the site or furnishing materials and equipment for the Project, subject to an agreement under which an interest therein or an encumbrance thereon is retained by the seller or otherwise imposed by the Contractor or such other person."

The unrecorded portion of the general contract was amended on April 16, 1978, to add the following provisions:

"3. Additional Terms

* * *

(d) Seller agrees that the building shall be completed free and clear of all mechanics' and materialmen's liens.

(e) The general contractor and all subcontractors and materialmen hereby waive all mechanics' liens and materialmen's liens.

(f) STRUCTON CORPORATION will hold purchaser harmless against all mechanics' liens and mechanic's lien litigation."

The entire general contract, including amendments, was recorded on March 23, 1979.

Structon entered into a subcontract with Luczak on August 23, 1978, for the installation of galvanized metal lathing and the application of Air Entraining Portland Cement stucco on the exterior walls of the residence. Luczak was to be paid $6,900 for the work, which was completed on October 7, 1978, but it has received only $3,000. A subcontract for heating, air-conditioning, and ventilating work was executed by Structon and Scarlet Glow on June 21, 1978. Scarlet Glow

provided labor and materials in the value of $4,500 before it was instructed by Structon to cease work on the project because Generes refused to make any further payments. Scarlet Glow received no payment. Each of the subcontracts provided that it would "conform to" the AIA document, but no copy thereof was attached.

The general contract provided for progress payments to be made by Generes in the following amounts: $29,000 upon completion of the first floor; $23,000 upon completion of the second floor; $26,000 upon completion of the roof sheeting; $28,000 upon inspection approval of the village of Northbrook; and $27,500 upon receipt of a village occupancy certificate. However, the contract further provided that no payments would be made unless Generes received Structon's sworn statement of the amounts paid and to be paid to subcontractors and waivers of lien from the contractor and subcontractors for the work completed. Generes made the first three payments upon receipt of contractor's statements dated June 23, June 28, and June 29, 1978. Although the payments were made in the amounts requested in the statements which complied with the scheduled progress payments in the contract, no waivers of lien were received from Luczak and Scarlet Glow. Generes received a fourth contractor's statement on February 7, 1979, but refused to make further payments because no lien waivers in conformity with the contractor's statements were provided. Generes terminated the general contract on April 5, 1979, before the residence was completed, and Structon brought suit to foreclose a mechanics' lien against the property in question, naming as defendants Generes and various lien creditors, among them Luczak and Scarlet Glow. Luczak then counterclaimed for the foreclosure of a mechanics' lien and for breach of contract against Structon. Scarlet Glow also counterclaimed, seeking foreclosure of a mechanics' lien, breach of contract damages against Structon, and damages for conversion against Paul H. Bach, president of Structon. This appeal is concerned solely with the trial of the two counterclaims.

## Luczak's Claim

Norbert Paprocki, a foreman employed by Luczak, testified that he worked on the subject property periodically from July to October of 1978. He was instructed by his employers to install metal laths and stucco to a thickness of three-quarters of an inch or more to the exterior of the building. The pattern of the stucco was to conform to that used in the model home and, since he had applied the stucco on the model, he instructed the employees working on the Generes residence how to do it. A short time later, while the men were still working, he

(Paprocki) learned that Generes was not satisfied with the pattern of the stucco, complaining that the texture was too heavy. He told his men to change the pattern, and later learned that Generes accepted it although it was slightly different from the model. When completed, the stucco was between seven-eighths and one inch thick and the pattern was somewhat rougher than that in the model home.

James Luczak, secretary-treasurer of Luczak, testified that Paul Bach, president of Structon, provided the plans and specifications for the work, which were the same as for the model home, and the work done by Luczak on the Generes residence was in conformity therewith. The pattern used on the stucco had a minimum thickness of three-quarters of an inch, and when texture was added the total thickness would be seven-eighths to one inch. Air Entraining Portland Cement was ordered and used in performing the work. An invoice was sent to Structon in the amount of $6,900, but only $3,000 was received in payment. He (Luczak) was never informed that the general contract contained a waiver of lien provision and was not shown a copy of that document, nor did he ask to see it. He never read the AIA document, although he was aware that his contract had to conform thereto. There is no substantial difference between three-quarters of an inch of stucco and seven-eighths of an inch, and no complaints were received about the work done.

Paul Bach, called as an adverse witness, testified that the general contract called for three-quarters of an inch of Air Entraining Portland Cement, and he knew that was used because he saw it on the jobsite and observed Luczak's men applying it. Generes did complain about the stucco work, but to his (Bach's) knowledge, the problem was corrected and the stucco work on the Generes residence was equal to or better than that on the model home. After the work was completed, Generes stated in a letter that he was dissatisfied with the stucco finish because it was not exactly the same as the model. The three contractor's statements for which payment was received showed a contract with Luczak for $8,000 which had not been paid. The fourth statement, for which no payment was received, stated that Luczak was paid $6,900 for the work completed, although Luczak in fact was not paid until April 12, 1979, and then received only $3,000 of the money due. The subcontractors did not receive copies of the general contract and were not told of the waiver provisions therein. Although the subcontracts refer to the AIA document, he (Bach) did not know it contained a waiver of lien provision and did not discuss any of its provisions with the subcontractors. Generes, who is an attorney, wrote the general contract.

Tasker Generes, called as an adverse witness, testified that according to the general contract, construction of the residence was to conform to the plans and specifications for the model home, to the FHA minimum standards for multifamily housing, and to the building code of the village of Northbrook. The specifications call for three-quarters of an inch of stucco, but the FHA standard calls for seven-eighths of an inch. He (Generes) measured the stucco in two places approximately 2½ years after the work was completed and found that it was only one-half inch thick. No measurements of the stucco were taken during construction of the residence. There is a difference in the pattern of the stucco on his residence and that on the model home, but he said that opinions could differ as to whether the difference was great or small. He had taken no steps to correct the alleged defects and did not have any idea of the cost to do so.

Irving M. Addis, an architect, testified that he was retained by Generes to examine the structure and mechanical equipment in the residence and compare them to the drawings and specifications prepared by Bach. He inspected the residence in May of 1979 and noted that the pattern of stucco was not uniform around the building. He measured the stucco at one point near the chimney in December 1981 and found it to be one-half inch thick. Extremes of weather would not affect the thickness of stucco over a three-year period. The building code of Northbrook requires a one-inch thickness of stucco.

Generes testified on his own behalf that he read the AIA document, discussed it with Bach, and modified it before incorporating it into the general contract. While the stucco was being applied, he noticed that the pattern was different from the model home, but when he complained he was told the pattern could not be changed and he would have to accept it. Later, the workmen did modify the pattern, and there are now three different patterns on the front of the residence and four or five different patterns on the back. On each of the first three contractor's statements, he noted that $8,000 was due on a contract with Luczak, but nothing had been paid. The fourth statement showed that Luczak was paid $6,900 and he also saw a final lien waiver executed by Luczak. He acknowledged that he did not pay any money when the Luczak waiver was shown to him, and that he received an occupancy permit from the village of Northbrook.

### SCARLET GLOW'S CLAIM

Edward McCracken, a sheet metal work foreman for Scarlet Glow, testified that he worked on the Generes residence at various times between June 30, 1978, and January 3, 1979. As of the latter

date, the work was 85 to 90% completed. Duct work was completed for the heating and the bath and kitchen exhaust systems, and the gas flume and smoke pipe were installed, as were a Lenox 165,000 BTUH furnace, an Aprilaire humidifier, and an electronic air cleaner. An air-conditioning unit, thermostat, and registers were delivered to the general contractor's office but were not installed in the residence by Scarlet Glow. Scarlet Glow did not install the laundry chute or provide gutters and flashings. He received no complaints about the work that was done.

Robert Rieder, comptroller of Scarlet Glow, testified that it provided approximately $4,500 in labor and materials during work on the Generes residence but had not received any payment. All materials required by the contract were delivered to the jobsite, the last delivery being made on February 8, 1979. Scarlet Glow ceased working after receiving a letter from Structon instructing it to do so because Generes had not made the required payments.

Bach, again called as an adverse witness, testified that Generes insisted that an express waiver of lien provision be added to the general contract, but assured him (Bach) that if a dispute arose over the contract, he could still file a lien. Subcontractors were not given notice of these added provisions. Scarlet Glow delivered a thermostat, an air-conditioning unit, and registers to his office, and these items were installed in the Generes residence. He (Bach) initiated termination of the contract when Generes refused to make the fourth payment. Subcontractors were instructed to cease working on the Generes residence in February or March of 1979. Generes insisted on receiving contractor's statements, and they were prepared to account for the sums due under the progress payment schedule set forth in the general contract. Some of the statements in the affidavit with regard to contract amounts, work completed, material dollar value, amounts previously paid, and net amounts due were false. The affidavits were prepared by his (Bach's) secretary, then signed by him and given to Generes. The checks received from Generes were deposited in Structon's general account, and no payments were made to Scarlet Glow because it had not yet done the work, although the statement indicated otherwise. There were no deficiencies in the work performed by Scarlet Glow, and the only complaint received from Generes was that the furnace was installed later than scheduled.

Generes testified as an adverse witness that he was to make progress payments to Structon after receiving a contractor's statement and waivers of lien from the contractor and subcontractors for the work completed. The second contractor's statement indicated that

$3,000 was due Scarlet Glow, and when he paid Structon he intended that part of the money be used to pay Scarlet Glow, although he did not withhold $3,000 or receive a waiver of lien. The third statement showed that Scarlet Glow had completed $4,500 of the work, that $3,000 had been paid, and that $2,300 was due on work yet to be completed. The fourth statement indicated that Scarlet Glow had not been paid at all. He (Generes) terminated the general contract on April 5, 1979, and Scarlet Glow had not completed its work. As originally written, the contract contained a payment schedule, but that was eliminated when the contract was modified. He (Generes) prepared the general contract with the help of another attorney.

Addis testified that, pursuant to his agreement with Generes, he inspected the work done by Scarlet Glow. On December 19, 1981, he looked at the furnace, duct work, and openings. The ducts got cooler to the touch the farther he got from the furnace, which indicated a design deficiency resulting in insufficient air movement.

Generes testified on his own behalf that when he inspected the residence on April 10, 1979, the air-conditioner, humidifier, range exhaust duct work, dryer vent, thermostat, registers, and the internal mechanism of the electronic air cleaner had not been installed. He called Scarlet Glow and asked them to come back to finish the work, but they refused to do so unless paid the $4,500 due. He (Generes) thought that was too much for the small amount of work done, and engaged other contractors to complete the work. On December 19, 1981, he tested the system by setting the thermostat at 70 degrees and placing thermometers in various rooms. Temperatures ranged from 58 to 80 degrees. He acknowledged that he did not know whether the system was ever balanced; that he did not withhold money from his payments to Structon to cover the payments due subcontractors; that the general contract had a payment schedule, and that schedule was followed; that other contractors had worked on the heating system since it was installed; and that a different contractor installed the air-conditioner, but he never complained to that contractor about problems with cooling since he just assumed that the problems were caused by Scarlet Glow's duct work.

The trial court found that the provision in the subcontracts requiring Luczak and Scarlet Glow to "conform to" the AIA document was not the type of notice contemplated by section 21 of the Mechanics' Liens Act (Ill. Rev. Stat. 1979, ch. 82, par. 21); and that paragraph 9.3.3 of the AIA document was not a waiver of the subcontractor's liens. With regard to Luczak's counterclaim, it found that Generes did not rely on the final lien waiver executed by Luczak; and that Luczak

had substantially performed its contract and was entitled to a mechanics' lien in the amount of $3,900 and a judgment against Structon in the amount of $3,900 for breach of contract. With regard to Scarlet Glow's counterclaim, the court found that it was entitled to a mechanics' lien in the amount of $2,380, a lien of $4,500 against any funds found to be due Structon from Generes, and a judgment in the amount of $4,500 against Structon for breach of contract. It further found that Scarlet Glow had not met its burden of proving that Bach had converted funds belonging to it. Generes' post-trial motion was denied, and this appeal followed.

OPINION

Generes first maintains that the trial court erred in ruling that Luczak and Scarlet Glow did not waive their rights to a mechanics' lien against the property in question. His contention is based on two distinct arguments: (1) that references to the AIA document in both the general contract and the subcontracts were sufficient to constitute notice of the express waiver of lien provisions contained in the general contract as required by section 21 of the Mechanics' Liens Act; and (2) that the AIA document incorporated by reference into the subcontracts expressly waives the subcontractors' lien rights.

Turning to Generes' initial argument, we note that section 21 provides that "[i]f the legal effect of any contract between the owner and contractor is that no lien or claim may be filed or maintained by any one, such provision shall be binding" on the subcontractor, but only if one of two notice conditions is met. (Ill. Rev. Stat. 1979, ch. 82, par. 21.) Either the subcontractor must have actual notice of the waiver before he furnishes any labor or material, or the contract between the owner and the general contractor must be recorded within the statutorily prescribed time period. (Ill. Rev. Stat. 1979, ch. 82, par. 21.) Generes concedes that the amended general contract, which contained an express waiver of liens by both the contractor and all subcontractors, was not filed in compliance with section 21. However, he maintains that the timely recordation of the first three pages of the general contract, which incorporated the AIA document, gave notice of the waiver provisions contained in paragraph 9.3.3 thereof. He further argues that the AIA document incorporated by reference in the subcontracts of Luczak and Scarlet Glow required them to read the general contract in its entirety, and thus constituted actual notice of the express waiver provision contained therein.

Generes' first argument assumes that the legal effect of paragraph 9.3.3 of the AIA document is that no lien may be filed or main-

tained by anyone, since that is the only type of provision which will satisfy the requirements of section 21 of the Mechanics' Liens Act. Therefore, we must ascertain the intention of the parties (*Chemical Petroleum Exchange, Inc. v. Metropolitan Sanitary District* (1980), 81 Ill. App. 3d 1005, 401 N.E.2d 1203) by looking first to the language of their agreement (*Crane v. Mulliken* (1980), 86 Ill. App. 3d 1076, 408 N.E.2d 778) and giving the words used therein their ordinary, natural meaning (*Barnes v. Rakow* (1979), 78 Ill. App. 3d 404, 396 N.E.2d 1168). Any doubts or ambiguities raised by that language will be resolved against the drafter (*Epstein v. Yoder* (1979), 72 Ill. App. 3d 966, 391 N.E.2d 432) and against a finding of waiver (*Edward Hines Lumber Co. v. Dell Corp.* (1977), 49 Ill. App. 3d 873, 364 N.E.2d 368), since "it should be presumed, in the absence of clear evidence to the contrary, that one has not disabled himself from the use of so valuable a privilege as that given by statute for the enforcement of builder's rights" (*Burgoyne v. Pyle* (1931), 261 Ill. App. 356, 369).

■ Under the plain language of paragraph 9.3.3 of the agreement, which was drafted by Generes, Structon made two promises. First, it warranted that the property would pass to Generes free of any liens when it (Structon) received payment. In effect, it is a guarantee that all subcontractors and materialmen would be paid if Structon were paid. Thus, the language does not even waive Structon's right to a mechanics' lien in the event of nonpayment, and merely provides Generes with a remedy against Structon should one of the subcontractors assert a lien after Structon had been paid in full. Second, Structon warranted that none of the labor or material used in construction would be acquired by anyone "subject to an agreement under which an interest therein or an encumbrance thereon is retained by the seller or otherwise imposed by the Contractor or any other person performing work at the site." Generes, here, used the words "subject to an agreement" rather than "subject to a lien." It appears that this language was used deliberately and does not include liens, since paragraph 9.3.3 provides that the word "lien" shall include all liens, claims, security interests or encumbrances. Having included this broad definition for "lien," Generes nevertheless chose to use the word "agreement"; therefore, we must give that word its ordinary meaning and will not read it as including liens. The reference, then, is to security agreements alone and is inapplicable to mechanics' liens, since they do not arise by agreement but by statutory grant. Moreover, the language employed merely gives Generes a right of action against Structon should it breach its warranty, with no waiver of the rights of third parties to assert their claims. We do not believe

that the legal effect of this provision is, as Generes maintains, that "no lien or claim may be filed by any one." Thus, any notice Luczak and Scarlet Glow might have had thereof is immaterial, since section 21 of the Mechanics' Liens Act is inapplicable.

■■ Generes also argues that the AIA document incorporated in the subcontracts by reference requires the subcontractors to read the general contract in its entirety, including the express waiver of lien provisions added before the subcontracts were executed. In effect, he contends that they had "actual notice" as opposed to recorded notice of these provisions. Luczak and Scarlet Glow posit that since they never saw or read the AIA document, they had no notice of its provisions. Their position is untenable, however, since they have not contested the trial court's ruling that the subcontracts incorporate the AIA document by reference. Once that point is conceded, Luczak and Scarlet Glow may not avoid the terms of their agreement by an assertion that they neglected to read the provisions thereof. (See *Leon v. Max E. Miller & Sons, Inc.* (1974), 23 Ill. App. 3d 694, 699, 320 N.E.2d 256, 260.) Therefore, we must determine whether the terms of the AIA document constitute actual notice of the express waiver contained in the general contract.

■■ Actual notice is "such notice as is positively proved to have been given to a party directly and personally, or such as he is presumed to have received personally because the evidence within his knowledge was sufficient to put him upon inquiry." (Black's Law Dictionary 957 (5th ed. 1979).) Generes relies on the latter definition when he reasons that since paragraph 5.3 of the AIA document requires that the subcontractors' work "be performed in accordance with the requirements of the Contract Documents," they had to read the general contract to discover those requirements and, had they done so, they incidentally would have seen the waiver provisions. We agree with the trial court's ruling that this is not the type of notice contemplated by section 21 of the Mechanics' Liens Act. Under paragraph 5.3, the subcontractor need only concern himself with those portions of the general contract directly relating to work performance; that is, the plans and specifications with regard to the work subcontracted. Such knowledge did not require a reading of the entire general contract, or even a portion thereof; since, at least in the instant case, the plans and specifications were provided to the subcontractors by Structon and the specific work requirements were set forth in detail in each subcontract. If Generes wished to bind the subcontractors to the express waiver contained in the general contract, he could have done so quite easily by recording the entire document

as provided in section 21. Having failed to do so, he cannot now impose upon the subcontractors some generalized duty to discover those provisions.

Generes also argues that paragraph 9.3.3 of the AIA document, incorporated by reference in the subcontracts, is an express waiver by Luczak and Scarlet Glow of their lien rights. However, as we noted earlier, that paragraph is in the nature of a warranty by Structon, not a waiver of lien. It is clear from the definitions of contractor and subcontractor contained in paragraphs 4.1.1 and 5.1.1 of the AIA document respectively, that these warranties were not made by Luczak or Scarlet Glow. Paragraph 4.1.1 defines contractor as "the person or organization identified as such in the Agreement ***"; while subcontractor is separately defined at paragraph 5.1.1 as "a person or organization who has a direct contract with the Contractor to perform any of the Work at the site." The subcontracts executed by Luczak and Scarlet Glow identify Structon as the contractor. Furthermore, that portion of paragraph 9.3.3 which Generes asserts constitutes a waiver; *i.e.*, the warranty that no labor or materials provided shall be subject to a security agreement, is inapplicable to statutorily created liens. For these reasons, we believe that the trial court did not err in finding that Luczak and Scarlet Glow did not waive their rights to mechanics' liens.

■■ Generes next contends that, as a matter of law, Luczak's delivery of a final lien waiver to Structon constitutes an absolute bar to its action for a mechanics' lien. He correctly notes that a clear, unambiguous waiver of lien rights bars an action under the Mechanics' Liens Act (*William Aupperle & Sons, Inc. v. American National Bank & Trust Co.* (1975), 28 Ill. App. 3d 573, 329 N.E.2d 458) regardless of whether adequate consideration was received therefor (*Capitol Plumbing & Heating Supply Co. v. Snyder* (1969), 104 Ill. App. 2d 431, 244 N.E.2d 856); however, this rule is applicable only where an innocent party has relied upon that waiver in making payments to the general contractor (compare *Contract Builders Service Corp. v. Eland* (1981), 101 Ill. App. 3d 366, 428 N.E.2d 178, with *Edward Hines Lumber Co. v. Dell Corp.* (1977), 49 Ill. App. 3d 873, 364 N.E.2d 368). Therefore, the question here is not whether tender of a final lien waiver bars recovery, but whether the lien waiver provided to Structon was delivered to Generes and relied upon by him in making payments. This is a question of fact, and we will not disturb the trial court's finding thereon unless it is contrary to the manifest weight of the evidence. *La Grange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 436 N.E.2d 645.

In the instant case, Generes initially contended in its briefs that delivery of the lien waiver to Bach, president of Structon, was sufficient because Bach was his agent. At oral argument, however, Generes conceded that no agency relationship existed. Furthermore, he does not dispute that while the lien waiver was shown to him by Bach in an attempt to obtain the fourth payment, it was not delivered to him (Generes) because he refused to pay, and that no payments were made subsequently to Structon in reliance thereon. Since these facts support the trial court's conclusion that Generes did not rely on the final lien waiver in question, it is our view that its finding is not against the manifest weight of the evidence.

■ Finally, Generes contends that the trial court's finding that Luczak and Scarlet Glow substantially performed their contracts is against the manifest weight of the evidence. With regard to Luczak's counterclaim, he argues that its failure to conform the stucco pattern to that used in the model home, to use the type of cement required by the contract, and to comply with the one-inch thickness of stucco required by the Building Code of the village of Northbrook constituted a material breach of contract which barred any recovery.

A determination whether the provisions of a contract have been substantially performed depends on the particular facts of a given case (*Joray Mason Contractors, Inc. v. Four J's Construction Corp.* (1978), 61 Ill. App. 3d 410, 378 N.E.2d 328), and the trial court's findings thereon will not be disturbed unless contrary to the manifest weight of the evidence (*Miller v. Racine Trust* (1978), 65 Ill. App. 3d 207, 382 N.E.2d 41; *George Butkovich & Sons, Inc. v. State Bank* (1978), 62 Ill. App. 3d 810, 379 N.E.2d 837). Here, Generes himself conceded that opinions might differ as to whether the variation in pattern was great or small, while Paprocki and Bach testified that the patterns were only slightly different. Additionally, the only testimony with regard to the type of cement applied indicates that Luczak used Air Entraining Portland Cement as required by the contract. It appears that the standards incorporated in the contract contained conflicting provisions with regard to the thickness of stucco to be applied; the specifications required three-quarters of an inch, the FHA standard required seven-eighths of an inch, and the Building Code of the village of Northbrook required one inch. There was conflict in the testimony on the question of how thick the stucco actually was. Witnesses for Generes testified that it was one-half inch thick; while witnesses for Luczak testified that it was seven-eighths to one inch thick. The trial court found the latter more credible, and we will not disturb his finding thereon, since he was in a superior position to assess

the credibility of these witnesses. (*Agrinetics, Inc. v. Stob* (1980), 90 Ill. App. 3d 107, 412 N.E.2d 714.) Generes argues that failure to comply with the Building Code by applying a full inch of stucco bars recovery; however, even if the stucco were only seven-eighths of an inch thick, "[w]here a slight violation of the law is involved by which the public interest is not harmed in a substantial way the breach of the contract will be overlooked, and recovery on the contract will be allowed." (*South Center Plumbing & Heating Supply Co. v. Charles* (1967), 90 Ill. App. 2d 15, 18, 234 N.E.2d 358, 360.) Here, the uncontradicted testimony is that a one-eighth inch variation in the thickness of stucco is not substantial. There is no testimony with regard to how the public interest is harmed by this variation, nor even how Generes is harmed, since a village occupancy permit was issued despite the alleged failure to comply with the Building Code. Moreover, if in fact some breach occurred, whether or not substantial, the proper course would not be to bar the mechanics' lien, but to allow Generes a setoff for damages caused by the alleged breach (see *Dean v. Rutherford* (1977), 49 Ill. App. 3d 768, 364 N.E.2d 625; *Narowetz Heating & Ventilating Co. v. Solar Sales, Inc.* (1967), 86 Ill. App. 2d 387, 230 N.E.2d 37); however, Generes made no claim therefor at trial and admitted that he had taken no steps to correct the alleged defects or even to ascertain the cost of such correction.

■ With regard to Scarlet Glow's counterclaim, Generes argues that it is not entitled to a mechanics' lien because (a) it abandoned the project before completion, (b) the portion of the work completed before abandonment was defective, and (c) materials Scarlet Glow claims to have provided were not in fact delivered. Turning to Generes' first argument, we note that a contractor or subcontractor claiming a mechanics' lien must show performance of the contract or an excuse for nonperformance, such as breach of the contract by the other party. (*Miller v. Reed* (1973), 13 Ill. App. 3d 1074, 302 N.E.2d 131.) In the latter case, under section 4 of the Mechanics' Liens Act, the contractor is entitled to abandon the work and enforce a lien for the value of the work performed. (Ill. Rev. Stat. 1979, ch. 82, par. 4; see also *Contract Builders Service Corp. v. Eland* (1981), 101 Ill. App. 3d 366, 428 N.E.2d 178.) Here, Scarlet Glow showed, and Generes does not dispute, that Structon breached its subcontract with Scarlet Glow by failing to pay it for the work performed; but Generes asserts that he asked Scarlet Glow to return and complete the work after the general contract was terminated. However, Generes further testified that he refused Scarlet Glow's request to cure the breach by paying the $4,500 due to it before it resumed work. Scarlet Glow

would have been justified in assuming that it would never be fully compensated for the work and materials already provided, since Generes informed it that, in his opinion, the amount requested was "too much" for the work done, and he would not pay it. For these reasons, we do not believe that Scarlet Glow "willfully and intentionally abandoned the construction project," as Generes maintains; rather, Structon breached the subcontract, and Generes' demand that Scarlet Glow return to work without being paid for work already performed did not alter that fact. Therefore, Scarlet Glow was entitled to recover for the work actually performed pursuant to section 4 of the Mechanics' Liens Act.

Generes next asserts that the work performed by Scarlet Glow was defective. There was conflicting testimony on this point, and we will not disturb the trial court's determination of the credence to be accorded the witnesses or the weight to be given their testimony unless it is against the manifest weight of the evidence. (*Schoenberger v. Chicago Transit Authority* (1980), 84 Ill. App. 3d 1132, 405 N.E.2d 1076.) In the instant action, Generes testified to the wide variations in temperature in the residence, and Addis, called by Generes as an expert witness, testified that his examination of the duct work indicated a "design deficiency." However, Generes admitted that other contractors had worked on the system in the three years since its installation; that he did not know if the system had ever been balanced; and that he did not complain to the contractors he engaged to complete the work about the problems because he "just assumed" they were caused by Scarlet Glow's duct work. Furthermore, there is nothing in the record before us to indicate that Scarlet Glow's work was not in accordance with the specifications or that it was responsible for the design of the system. The trial court resolved this factual question in Scarlet Glow's favor, and we do not believe, based on the foregoing testimony, that its determination was against the manifest weight of the evidence.

■ Generes' further contention that various items which Scarlet Glow claimed to have delivered for use in his residence were not in fact delivered is similarly without merit. Section 7 of the Mechanics' Liens Act (Ill. Rev. Stat. 1979, ch. 82, par. 7) provides in relevant part:

> "[N]or shall any such lien for material be defeated because of lack of proof that the material after the delivery thereof, actually entered into the construction of such building or improvement, although it be shown that such material was not actually used in the construction of such building or improvement; Pro-

vided, it is shown that such material was delivered either to the owner or his or her agent for that building or improvement, to be used in that building or improvement, or at the place where said building or improvement was being constructed, for the purpose of being used in construction *** ."

Thus, a subcontractor providing materials is entitled to assert a lien upon a showing that materials were delivered for the purpose of being used in construction, regardless of whether they were in fáct so used. (*Hinkle v. Creek* (1969), 113 Ill. App. 2d 454, 251 N.E.2d 111.) Here, employees of Scarlet Glow testified that an air-conditioning unit, a thermostat, and registers were delivered to Structon's office in the model home for installation in the Generes residence, and Bach confirmed that these items were so delivered. There is nothing in the record to refute this testimony, and Generes, in his briefs, admits that Structon was his agent for this purpose. Therefore, Scarlet Glow has met its burden of proof as set forth in section 7, and it is not defeated by Generes' assertion that the items delivered were not in fact installed in his residence.

In its cross-appeal, Scarlet Glow first contends that the trial court erred in limiting its lien against the property in question to $2,380 rather than allowing the full amount of $4,500 found to be the value of the labor and materials actually provided. It argues that, under section 27 of the Mechanics' Liens Act (Ill. Rev. Stat. 1979, ch. 82, par. 27), Generes was required to retain sufficient funds to pay the claims of subcontractors and that, having failed to do so, Generes is not entitled to receive any credit for the payments made to Structon.

It is established that an owner who relies on a contractor's affidavit in making payments is protected as against subcontractors if he has no knowledge or notice of the falsity of any statements therein (*Sanaghan v. Lawndale National Bank* (1967), 90 Ill. App. 2d 254, 232 N.E.2d 546); but once an owner has notice of a subcontractor's claim, he must retain sufficient funds to pay that claim, and he is not entitled to a credit for payments made in derrogation of the subcontractor's rights, even if the general contractor has been paid in full (*Brady Brick & Supply Co. v. Lotito* (1976), 43 Ill. App. 3d 69, 356 N.E.2d 1126; *Krack Corp. v. Sky Valley Foods, Inc.* (1971), 133 Ill. App. 2d 469, 273 N.E.2d 202). Here, the contractor's statements required by section 5 of the Mechanics' Liens Act (Ill. Rev. Stat. 1979, ch. 82, par. 5) were provided and listed Scarlet Glow as a subcontractor in the amount of $6,850; thus, Generes had notice of Scarlet Glow's claim. The second statement indicated that $3,000 was due,

and a balance of $3,880 was to become due; the third statement listed a $3,000 payment to Scarlet Glow, with $1,500 then due and a balance of $2,380 to become due. Generes made the full payments requested on each of these statements. It is Scarlet Glow's position that these payments were wrongful because Generes failed to retain any of the funds in question and he therefore should not be allowed any credit for the payment made. In effect, Scarlet Glow suggests that we disregard the fact that two more payments totaling $55,500 were yet to be made—funds more than sufficient to cover its claim—because the general contract was breached at a later date and Generes' position at trial was that no additional funds were due anyone as a result of that breach.

Scarlet Glow does not cite, nor has our own research discovered, any case which supports its position. However, we need not address this question in the instant case, for the trial court's ruling is not based on Generes' claim that no further funds were due anyone. In fact, despite that claim, and while the suit between Generes and Structon was as yet unresolved, the court imposed a lien against the property in Scarlet Glow's favor. What the trial court found was that Generes had relied on Structon's statement that $4,500 had been paid to Scarlet Glow, leaving a balance due of $2,380. The identical situation arose in *Knickerbocker Ice Co. v. Halsey Brothers Co.* (1914), 262 Ill. 241, 104 N.E. 665, wherein the supreme court first held that an owner may rely upon the truth of a contractor's sworn statement in the absence of notice to the contrary. There, the owner had notice of a subcontractor's claim through a contractor's statement showing a subcontract in the amount of $1,550.50. Subsequent statements contained false information showing various amounts due under the subcontract, and the owner, in reliance thereon, paid the general contractor until the balance to become due shown on the statement was $900. The final contractor's statement, however, showed that the true balance due was over $1,400. The supreme court held that the subcontractor was entitled to a lien only in the amount of $900, because the owner had justifiably relied on the contractor's sworn statement that monies paid to him were being sent to the subcontractor. Similarly, here, Generes made payments in reliance on the contractor's sworn statement that portions thereof had been, or would be, transmitted to Scarlet Glow. Moreover, Scarlet Glow has not contended here that Generes did not rely on those statements; therefore, it is entitled to a lien only in the amount shown to be due on the last statement for which payment was made, and must look to Structon for the balance of its claim. (See *Knickerbocker Ice Co. v. Halsey Brothers Co.* (1914),

262 Ill. 241, 246, 104 N.E. 665, 666.) In this vein, we note that the trial court imposed a lien in the amount of $4,500 in Scarlet Glow's favor on any funds subsequently determined to be due Structon under the general contract, as well as breach of contract damages in the amount of $4,500 against Structon.

■ Scarlet Glow also maintains that the trial court's finding that it failed to prove its claim for conversion against Bach is against the manifest weight of the evidence. It argues that its claim was adequately proved by uncontroverted testimony that Bach collected payments in the amount of $4,500 which, according to his sworn affidavit, were due Scarlet Glow, and deposited those funds in Structon's general account, and that Scarlet Glow has never received payment.

Initially, we note that Bach has not filed a brief in this cross-appeal. While we will not act as his advocate in this matter (*People ex rel. Mihm v. Miller* (1980), 89 Ill. App. 3d 148, 411 N.E.2d 592), automatic reversal is not required (*In re Custody of Baty* (1980), 83 Ill. App. 3d 113, 403 N.E.2d 747), and "if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief, [we] should decide the merits of the appeal" (*First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495).

The sole question here is whether, on the record before us, Scarlet Glow has met its burden of proof. It was required to show that Bach committed some act which constituted the exercise of unauthorized control over property in a manner inconsistent with Scarlet Glow's right of possession (*Connelly v. Estate of Dooley* (1981), 96 Ill. App. 3d 1077, 422 N.E.2d 143); that it not only had property rights in the money but also "a right to immediate possession which is absolute and unconditional and not dependent upon the performance of some act" (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 932, 419 N.E.2d 578, 593); and that it made a demand for possession (*People ex rel. Carey v. Lincoln Towing Service, Inc.* (1977), 54 Ill. App. 3d 61, 369 N.E.2d 94) unless some other independent act of conversion can be shown such that a demand for possession would be futile (see *Jensen v. Chicago & Western Indiana R.R. Co.*).

■ In the instant case, Scarlet Glow maintains that Bach's conduct in collecting funds allegedly due Scarlet Glow and placing them in Structon's general account constituted conversion. However, it has not shown that, at the time these acts occurred, Scarlet Glow was entitled to receive any payment. The subcontractor provides that "[p]ayment shall be made *** as the work progresses monthly an amount

equal to (90%) ninety per cent of the value of the work completed during the preceding calendar month ***" and that no payments would be made unless invoices and shipping document were received showing the purchase order or contract number and job number. The last payment from Generes was received on July 31, 1978, but Scarlet Glow's work on the project did not begin until June 30, 1978, and extended through February 8, 1979. Furthermore, there is no evidence in this record that proper invoices were tendered to Structon as required by the subcontract, or that any demand was made for possession of the funds when they did finally become due. Therefore, we cannot say that the trial court's ruling was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

WILSON, P.J., and MEJDA, J., concur.